Middleton, J.
In argument the plaintiffs (appellants) state three questions of law, which in substance parallel the above-stated claims. They are:
(1) Have conditions so changed that the decision in the Renker case should be modified or overruled?
(2) Does the legislative enactment of 1951, which gives to the Public Health Council power to make regulations of general application throughout the state, supersede the power of a municipality to enact the ordinance here being challenged? If it does not, is the ordinance in conflict with state statutes and, therefore, unconstitutional?
(3) Is the ordinance an illegal exercise of the police power in that it is arbitrary and unreasonable or without direct relation to the public health, safety or welfare, and hence in violation of Section 1, Article XIV, Amendments, Constitution of the United States, and of Section 1 of Article I of the Constitution of Ohio?
The testimony and the agreed statement of facts indicate that the average trailer in plaintiffs’ park at the time of trial of this ease was 25 feet, 9 inches, in length by 8 feet in width, outside dimensions. The average inside floor area was approximately 200 square feet. In the Renker case the average floor space of the trailers was shown to have been approximately 119 square feet.
*124 Although the record shows that the trailers presently in this park are each equipped with water, sewer and electrical connections, many of the trailers are 'not equipped with individual toilets or shower facilities. The occupants of trailers not so equipped are compelled to use the public toilets and shower facilities provided in two comfort buildings on the premises. Although not established by any evidence, it is stated in the plaintiffs’ brief that trailers are generally of greater size today than they were some ten or twelve years ago; that all new trailers 22 or 23 feet in length are ‘ ‘ independent trailers, ’ ’ fully equipped with toilet, shower, washstand and bathroom facilities; that some trailers are as much as 50 feet long, sell for approximately $7,500, and are fully equipped; and that a large investment of capital is required to establish a trailer park.
Although the advance in the art of trailer construction, the increase in use of trailers and the increased investment in trailers may be conceded, such changes in conditions do not, in the judgment of this court, materially affect the problem faced by municipalities in the regulation of trailer camps or present a situation legally different from that presented in the Renker case. In fact, the increase in the number of house trailers and the popularity of their use would seem to intensify the problem faced by municipalities rather than to alleviate it.
The underlying and controlling problem is whether the public health, safety or welfare of the municipality is affected by the growth of permanent settlements within the municipality, comprised of numerous small buildings in close proximity, each having a floor area equal only to that of an average size room, but housing a family consisting of from two to six persons.
Recognizing the ever increasing importance of the problems growing out of the operation of trailer camps, several states, including Ohio, have passed leg *125 islation on the subject. The Ohio act, which was passed in 1951, is so brief that we quote, as follows, the entire act:
Section 1235-1, General Code (Sections 3733.01 and 3733.02, Revised Code):
“The Public Health Council, subject to the provisions of the Administrative Procedure Act, shall have the power to make regulations to be of general application throughout the state governing the location, layout, construction, drainage, sanitation, safety, and operation of house trailer parks. For the purposes of this act a house trailer park shall be defined as any site, lot, field, or tract of land upon which three (3) or more house trailers used for habitation are parked either free of charge, or for revenue purposes, and shall include any roadway, building, structure, vehicle or enclosure used or intended for use as a part of the facilities of such house trailer park. House trailer shall have a meaning as defined in Section 6290 of the General Code.”
Section 1235-2, General Code (Section 3733.03, Revised Code):
“On or after the first day of December but before the first day of January of the next year every person, firm or corporation proposing to operate a house trailer park during any part of the next year shall procure a license to operate such park for said year from the board of health of the district in which the house trailer park is located. Except as hereinafter provided no house trailer park shall be maintained or operated in this state after January 1, 1952, without such a license issued by the board of health. A person, firm or corporation who has received a license as aforesaid, upon the sale or disposition of said house trailer park may, upon consent of the board of health have said license transferred, but no license shall be transferred without such consent.”
*126 Section 1235-3, General Code (Section 3733.04, Revised Code):
“The board of health of the district in which the house trailer park is located may charge an annual fee for the right to operate such house trailer park. Such fee shall include the cost of licensing and all inspections and shall be as follows:
“For house trailer parks having capacity of less than twenty-five house trailers, not more than fifteen dollars; for house trailer parks having capacity of twenty-five or more house trailers and less than one hundred house trailers, not more than twenty-five dollars; and house trailer parks having capacity for one hundred or more house trailers, not more than thirty-five dollars. The basis for determining the capacity of house trailer parks shall be defined in regulations adopted by the Public Health Council under the provisions of Section 1235-1 of the General Code.”
Section 1235-4, General Code (Section 3733.99, Revised Code):
“Whoever violates any provision of this act shall be fined not to exceed one hundred dollars or imprisoned for not to exceed ninety days or both.”
Section 1235-5, General Code (Section 3733.05, Revised Code):
“The board of health of the district in which the house trailer park is located or to be located, in accordance with the provisions of the Administrative Procedure Act, may refuse to grant, may suspend or may revoke any license granted to any person, firm or corporation, for failure to comply with any regulation lawfully adopted by the Public Health Council under the provisions of this act.”
Unquestionably the statutes above quoted are general in character, and the regulations adopted by the Public Health Council pursuant to those statutes, which regulations are set forth in full in the record *127 in this case, are of general application. The statutes are not, however, such as to pre-empt the entire field of legislation with respect to trailer camps and to bar municipalities from adopting regulations on the same subject so far as such local regulations are not in conflict with general laws.
Section 3 of Article XVIII of the Constitution of Ohio .provides:
“Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws.”
In our judgment, the ordinance of the city of Brooklyn here in question was adopted in the exercise of its police power.
The next question then to consider is whether the ordinance conflicts with the general law announced in the statutes. The general law on this subject is well set forth in Village of Struthers v. Sokol (1923), 108 Ohio St., 263, 140 N. E., 519. The syllabus of that case reads:
“1. Municipalities in Ohio are authorized to adopt local police, sanitary and other similar regulations by virtue of Section 3, Article XVIII, of the Ohio Constitution, and derive no authority from, and are subject to no limitations of, the General Assembly, except that such ordinances shall not be in conflict with general laws.
“2. In determining whether an ordinance is in ‘conflict’ with general laws, the test is whether the ordinance permits or licenses that which the statute forbids and prohibits, and vice versa.
“3. A police ordinance is not in conflict with a general law upon the same subject merely because certain specific acts are declared unlawful by the ordinance, which acts are not referred to in the general law, or *128 because certain specific acts are omitted in the ordinance but referred to in the general law, or because different penalties are provided for the same acts, even though greater penalties are imposed by the municipal ordinance.”
Many other decisions of this court can be cited to support the rules of law which were announced in the Struthers ease, but it is sufficient to refer to the opinion in that case, written by Chief Justice Marshall, for a discussion of those decisions. The Struthers case has been followed and approved by this court in several decisions, including City of Youngstown, v. Evans, 121 Ohio St., 342, 168 N. E., 844; City of Columbus v. Barr, 160 Ohio St., 209, 115 N. E. (2d), 391. See, also, Egan v. City of Miami, 130 Fla., 465, 178 So., 132.
The rule announced in the Struthers case is in harmony with the general rule on the subject of conflict of local and general laws, as indicated by statements generally included in texts and digests, such as that contained as follows in 37 American Jurisprudence, 790, Municipal Corporations, Section 165:
“It has been held that in determining whether the provisions of a municipal ordinance conflict with a statute covering the same subject, the test is whether the ordinance prohibits an act which the statute permits, or permits an act which the statute prohibits.” See, also, 62 Corpus Juris Secundum, 291, Municipal Corporations, Section 143; 138 A. L. R., 1208.
It is to be noted that the ordinance in question prescribes a penalty for violation different from and in addition to that prescribed by the statute. Whether a conflict thus results is answered by the syllabus of the Struthers case, where it is recognized and stated that a penalty may be provided in an ordinance different from that provided in the statutes, without invalidating the ordinance. In support of that statement Chief Justice Marshall in the opinion at page 269 *129 cited many decisions from Ohio and other states, to which list of authorities many others might now be added.
Plaintiffs assert as one instance of conflict that the ordinance requires the operator of a trailer park to pay to the municipality an annual license fee of $25 and that Section 1235-3, General Code, authorizes the board of health of the district to charge an annual fee for the right to operate such a trailer park, which fee is graduated from $15 to $35 according to the trailer capacity of the park.
No claim is made that either fee is excessive, unreasonable or unrelated to the expense incurred by supervision or that the fee provisions are revenue raising measures.
The statute in question does not purport to vest in the board of health the sole right to assess a license fee and it does not deny to the municipality the right to assess such a fee.
Under such circumstances the law is well settled that both fees may be assessed. See 53 Corpus Juris Secundum, 490, Licenses, Section 10; 33 American Jurisprudence, 345, Licenses, Section 24.
The plaintiffs also base their argument in part upon the provisions of Sections 6290 and 6292-2, General Code (Sections 4501.01 and 4503.06, Revised Code), which, respectively, define the term, “house trailer,” and prescribe a tax upon house trailers. Section 6292-2 is too long to be quoted. It provides in substance for the payment of a tax by the occupant of a house trailer to the county in which the trailer is located,' graduated from $4.50 to $18, depending upon the month in the calendar year when the trailer becomes occupied and subject to the tax. It is specified that the tax is levied for the purpose of supplementing the general revenues of the local subdivision in which the house trailer is located at the time the tax becomes due, *130 and that, once paid, the certificate evidencing payment is good in any county of the state to which the trailer is moved. It is obvious that this tax statute has no relation to the regulatory provisions of the ordinance or to the main question involved in this case which is the restriction as to the length of time which the house trailer is permitted to be located in a trailer camp. The section specifically provides that “the revenues collected under the provisions of this section shall be in lieu of any general property tax.” The plaintiffs, however, claim support in the clause in Section 6292-2 which reads:
“The tax so levied shall become due and payable immediately upon the occupancy for human habitation of the house trailer except as hereinafter provided.” (Emphasis supplied.)
This clause, in our judgment, can not be construed as a grant of an unlimited privilege to use the trailer for human habitation in one location. It merely fixes the time when the tax becomes due and payable. In fact, the section clearly recognizes the usual conception of house trailer occupancy as being transitory and the probability that the trailer will be moved from one county to another, thus necessitating the provision that the receipt for the payment of the tax must be recognized by the officials of any county to which the trailer is moved.
It is manifest that the tax prescribed by Section 6292-2 is in the nature of a property tax and not a license fee for the privilege of occupying a house trailer.
This leaves for consideration only section 7 of the ordinance which limits the right of occupancy in a trailer park to 60 days and forbids occupancy there or elsewhere in a trailer camp within the same municipality until the elapse of another 90 days. The statutes contain no provision in the nature of a time limitation *131 on the use of a trailer camp as a location for a house trailer. As to that subject the statute is silent. Any provision limiting the time of occupancy within a trailer camp contained in the ordinance, therefore, can not be said to be in conflict with the statute.
We conclude .that the city ordinance does not permit or provide for licensing that which the statutes forbid and prohibit, nor does it forbid or prohibit that which the statutes permit. The ordinance is not in conflict with the statutes and can not be successfully attacked upon that ground.
To test the validity of the 60-day and 90-day provisions in the ordinance, we must, then, determine whether they are arbitrary and unreasonable as having no direct relation to the public health, morals, safety or welfare.
In the earlier decision of this court—the Renker case—reference was made to Cady v. City of Detroit, 289 Mich., 499, 286 N. W., 805, in which a 90-day occupancy limitation was upheld. The plaintiffs cite a more recent Michigan case, to wit, Richards v. City of Pontiac, 305 Mich., 666, 9 N. W. (2d), 885, which was decided June 7,1943, and which reaches an opposite conclusion. It was decided subsequent to the enactment of a statute not in force at the time of the previous decision of the Michigan court. The later decision is quoted as holding that, the state having entered the field of licensing tourist camps, additional fees can not be imposed by an ordinance and that a provision in an ordinance providing for a time limit for parking trailers in a trailer camp is void. That decision obviously is based upon the specific terms of the Michigan act, section 18 of which provides:
“This act shall be construed as an emergency act, for the public peace, health, and safety. There is a great shortage of habitable houses for defense workers and the trailer coach has become a necessity, and there *132 is a- great shortage and need of sanitary regulated trailer coach parks.”
The decision recites the purposes and scope of the act and holds that it was intended to apply to house trailers as permanent dwellings. We do not consider the later Michigan decision applicable authority in the instant controversy.
The case of Spitler v. Town of Munster, 214 Ind., 75, 14 N. E. (2d), 579, 115 A. L. R., 1395, cited in the Renker case and in which a 30-day limitation for occupancy was upheld, appears not to have been disturbed by the Indiana court.
In Gillam v. Board of Health of Saugus (1951), 327 Mass., 621, 100 N. E. (2d), 687, the operators of a trailer coach park (trailer camp) petitioned for a writ of mandamus to compel the board of health to renew their license to operate the park. The regulations of the board prohibited occupancy of such a park for more than 90 days in any six months. For violation of that regulation renewal of the license was refused. This refusal was sustained and the regulation was held valid. The court said in part:
“The rule in question cannot be pronounced lacking in rational purpose. In other states similar rules have been held valid, as tending to prevent permanent occupation of dwelling places which do not conform to the requirements of building codes.”
It is interesting to note that absolute prohibition of the use of trailer camps or parks has been seriously considered as a solution of the problem. At least one reported case arose out of the enactment of such legislation. It is Commonwealth v. Amos (1941), 44 Pa. D. & C., 125, 30 Del. Co., 552. Although that ordinance was not sustained by the court, the problem of municipal regulation of trailer camps was recognized.
In the case of Allinder v. City of Homewood, 254 Ala., 525, 49 So. (2d), 108, 22 A. L. R. (2d), 763, in *133 junction was sought to prevent enforcement of a comprehensive ordinance of Homeville, Alabama, regulating tourist camps, tourist courts, motor courts and motels. It does not appear that the ordinance contained any provision limiting the term of occupancy. The decision does, however, announce several fundamental principles in harmony with those herein stated. It also refers to the claimed similarity of hotels and tourist courts (on which plaintiffs herein base an argument) and states that there are differences which justify regulations as to the one, which are not needed as to the other.
A comprehensive annotation with respect to trailer camps appears in 22 A. L. R. (2d), 774.
Because of the scarcity of authorities with respect to the specific question now under discussion we must rely largely upon general principles governing the exercise of the police power of a municipality. It has been vigorously argued in behalf of defendants that the use of trailer camps has grown far beyond the use originally conceived, and that the existence of unlimited permanent habitations of this character creates social problems and problems of health and government with which the municipal authorities must cope in a practical manner. The record in this case contains testimony that the house trailers in this particular camp in some instances are occupied by as many as six persons and that it is usual for families including children to occupy them. No playground equipment is provided. Common toilets are used to a large extent. Children have no privacy. The trailers are on the average no larger than an average size room in a house. Each trailer occupies an area about 25 feet by 44 feet in size. In most instances the areas adjacent to a trailer park, and all other parts of a city, are so zoned and regulated that houses of such size can not be built. It is urged that to permit permanent *134 occupancy of trailer camps is a discrimination against all the other citizens who are not permitted to build such structures or to occupy such limited quarters, and that permanent occupancy of trailer camps tends to create “slum districts.” It is conceded that the purpose of the 60-day and 90-day limitations is to require the occupants to move periodically and thus to prevent permanent occupancy. It has been argued with considerable force that occupancy for 61 days or longer can not be detrimental to public health, morals, safety or welfare, if occupancy for 60 days is not so detrimental. At first blush this argument seems to have much force. It is to be remembered, however, that the municipal authorities are faced with the necessity of action if permanent occupancy of such quarters creates problems of municipal government and tends to create slum districts. This problem is intensified by the increased use of house trailers as places of permanent abode. If the only practical means found to solve that problem is to forbid permanent occupancy it would seem to follow that the 60-day and 90-day regulations are not unreasonable or arbitrary and can not be said to be unrelated to the public health, morals, safety or welfare.
Legislation passed by the legislative body of a municipality can not be overthrown by the court unless such legislation is clearly arbitrary, unreasonable or unrelated to the public health, morals, safety or welfare. It is not for the courts to determine the wisdom of the legislation, but its constitutional validity, and a court will not substitute its judgment for that of the legislative body as to necessity for or wisdom of the legislation.
This is well stated in 28 Ohio Jurisprudence, 498, Section 303, as follows:
“ * * * in the determination of the reasonableness of ordinances, a court will not substitute its judgment for *135 the discretion of the municipal legislative authorities, who are presumed to be familiar with the local needs and conditions, so long as the provisions of such ordinance do not clearly transcend the limits of reasonableness.”
That statement is based upon several decisions of this court, including White v. Kent, 11 Ohio St., 550; Allion v. City of Toledo, 99 Ohio St., 416, 124 N. E., 237, 6 A. L. R., 426; Pritz v. Messer, 112 Ohio St., 628, 149 N. E., 30; City of Dayton v. S. S. Kresge Co., 114 Ohio St., 624, 151 N. E., 775, 53 A. L. R., 916.
We find no valid ground for overriding the judgment of the legislative body of Brooklyn with respect to this ordinance. In our judgment the ordinance is valid and enforceable.
The judgment of the Court of Appeals is affirmed.

Judgment affirmed.

Weygandt, C. J., Taut, Zimmerman and Lamneck, JJ., concur.
Stewart, J., concurs in paragraphs one, two, three, four and five of the syllabus, but dissents from paragraph sis of the syllabus and from the judgment.